EVE H. KARASIK (Cal. Bar No. 155356)
GABRIEL I. GLAZER (Cal. Bar No. 246384)
STUTMAN TREISTER & GLATT
PROFESSIONAL CORPORATION
1901 Avenue of the Stars, 12th Floor
Los Angeles, California 90067
Telephone: (310) 228-5600
Facsimile: (310) 228-5788

MICHAEL MOLLAND (Cal. Bar No. 111830)
MOLLAND LAW
30 Fifth Street
Petaluma, CA 94952
mmolland@mollandlaw.com
Telephone: (707) 202-5511
Facsimile: (707) 202-5513

BENJAMIN P. SMITH (Cal. Bar No. 197551)
MORGAN, LEWIS & BOCKIUS LLP
One Market
Spear Street Tower
San Francisco, California 94105
Telephone: (415) 442-1000
Facsimile: (415) 442-1177

Attorneys for the J.T. Thorpe Settlement Trust and Thorpe Insulation Company
Asbestos Settlement Trust

UNITED STATES BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
LOS ANGELES DIVISION

| | |
|---|---|
| In re<br><br>J.T. THORPE, INC., THORPE INSULATION COMPANY,<br><br>Debtor<br><br>———————————————<br><br>J.T. THORPE SETTLEMENT TRUST, THORPE INSULATION COMPANY ASBESTOS SETTLEMENT TRUST,<br><br>Plaintiff,<br><br>vs.<br><br>MICHAEL J. MANDELBROT and THE MANDELBROT LAW FIRM<br><br>Defendants. | Chapter 11<br><br>Case No. 02-14216-BB<br><br>Adversary Case No. 2:12-ap-02182-BB<br><br>Case No. 07-19271-BB<br><br>Adversary Case No. 2:12-ap-02183-BB<br><br>**REBUTTAL REPORT AND DECLARATION OF PETER R. MOENTER**<br><br>Hearing Date: January 21-23, 2014<br>Hearing Time: 9:00 am<br>Place: Courtroom 1475<br>       255 E. Temple St., 14th Floor<br>       Los Angeles, CA 90012<br>Judge: Honorable Sheri Bluebond |

I Peter R. Moenter, declare as follows:

1. I began employment with Long Beach Naval Shipyard as a civilian employee in 1965 and remained employed at Long Beach Naval Shipyard for over thirty years until my retirement in 1996. I began as a bench mechanic in the electronics shop at the shipyard. I was promoted to first line supervisor in 1968. I was promoted to General Foreman or manager of the electronics shop in 1973. In connection with my work at Long Beach Naval Shipyard, I also served as an overhaul manager, project manager, and union negotiator.

2. The work performed by the civilian shipyard workers at the shipyard is divided into "shops," each of which house the individual crafts utilized by the shipyard for the repair and maintenance of Navy ships. All work performed by the shipyard employees is performed either inside these shops, or aboard the ships the shipyard repaired or maintained.

3. While I was employed, the Long Beach Naval Shipyard generally employed between 7,000 and 10,000 civilian employees. During my tenure at the shipyard, I worked at least eight hours each working day both in the shops and aboard ships. In this regard, I became familiar with the organization, rules, and restrictions imposed by the shipyard on its employees and visitors, including the sailors who entered the shipyard from Navy ships which docked at the shipyard.

4. As first line supervisor and then General Foreman, I had responsibilities for overall management of the shop's work, both in the shop and aboard ship. Over the course of my career, I worked with all of the shops (and their associated personnel) at the Long Beach Naval Shipyard. After 1968, I was appointed project manager for several overhaul projects at the shipyard. As a project manager, I worked with all shipyard shops and unions to coordinate and manage the repair of certain ships. In the 1980s, I was one of four project managers for the extensive repair of two United States Navy Battleships, the USS New Jersey and the USS Missouri, which took place over many months and years. The overhaul of the USS New Jersey was a $450 million project.

5. As a General Foreman, I also served as a shop manager. In that capacity, I also

1 served as a contract negotiator for the Long Beach Naval Shipyard management with the yard's unions, most of which were consolidated through the Metal Trades Council. As a negotiator, I was responsible for representing management's side in negotiations which led to the creation of the shipyard's contracts with its primary unions, and I became knowledgeable about the terms and conditions of the union contracts that governed the terms of employment and restrictions on that employment at the Long Beach Naval Shipyard -- both before and after 1965.

6. I have reviewed the report and declaration of Captain Francis Burger and the affidavit of Mr. Paul Genthner, which are attached to this report. As to matters that pertain to the operations of the Long Beach Naval Shipyard from 1965 until three months prior to the closure of the shipyard in 1996, I have personal knowledge. In addition, based on my extensive employment at the Long Beach Naval Shipyard as described above, I know how the Shipyard operated in the 1950s and 1960s. As an expert in the operations of the Long Beach Naval Shipyard, I offer the following opinions, to a reasonable degree of certainty, in response to the reports and affidavits of Captain Burger and Mr. Genthner. I have never before served as an expert.

7. Navy sailors who were assigned to Navy ships which docked at the Long Beach Naval Shipyard shipyard for repair or maintenance were never in my experience employed by the shipyard to perform work in the shipyard. I am also unaware of any such Navy sailors being assigned to perform hands on work such as working with the tools of their trade off of their assigned ship and in the shipyard. There were very specific reasons why no such employment or work assignments were permitted.

8. No Navy sailor was permitted by the shipyard or the shipyard's unions to perform any work off the ship in the shipyard. Such work was forbidden by the shipyard management for safety reasons and liability concerns. Such work was also against union rules and would not have been allowed by the shipyard's unions. I know of no instance where it occurred and have never heard of it occurring.

9. I understand a claim is being made that sailors assigned to ships under repair at Long Beach Naval Shipyard left their ships and worked with or around asbestos insulation or

2

REBUTTAL REPORT AND DECLARATION
OF PETER R. MOENTER
Case No. 02-14216-BB

other asbestos products or boilers on land at the Long Beach Naval Shipyard, or assisted shipyard employees when they worked around asbestos insulation or boilers on land at the Long Beach Naval Shipyard. At most some Navy sailors in my experience would be tasked to observe the progress being done on equipment from their assigned ship or carrying materials to and from their ship. In my experience, any such observation duties would be limited in time and the number of Navy sailors assigned. Navy sailors assisting or working with shipyard employees would have been impossible under the shipyard's rules and union rules. I know of no instance when this occurred and never heard of it occurring in all of my thirty years at the shipyard.

10. Under the shipyard's safety rules, only persons employed by the shipyard were allowed to perform any work off the ship and in the shipyard. Liability concerns, worker's compensation concerns, and union contracts required the shipyard to normally prohibit non–employees, including U.S. Navy sailors, from performing any work off the ship at the shipyard.

11. As described above, occasionally, some sailors visited shipyard shops to check on the progress of repair work, or to pick up equipment that had been repaired. While the shipyard permitted these visits, they were strictly limited both in time and place by the shipyard for safety reasons and to avoid interference with shipyard work. Few sailors were ever permitted inside the shops for these purposes. When they were permitted inside the shops, their visits were in my experience quite brief. Such visits were limited by shop personnel. For safety and efficiency reasons, sailors were not permitted to loiter or congregate in or around any shops. If sailors did so, they were ordered to leave the premises.

12. Sailors aboard Navy vessels who left their ships were not permitted to loiter or remain in the shipyard. Navy sailors, to the extent in the shipyard, were merely passing through the shipyard to other destinations outside the shipyard. To my knowledge, that destination was most often the Naval Station – which had recreational and other facilities designed to house, feed, and entertain the sailors. The Naval Station was not part of the Shipyard, but was located adjacent to it on the East.

I declare under penalty of perjury under the laws of the United States of America and the

1  State of California that the foregoing is true and correct.

2      Executed this _____ day of November, 2013 at Fountain Valley, California.

3

4

5                                                      Peter R. Moenter

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                                      REBUTTAL REPORT AND DECLARATION
4                                                         OF PETER R. MOENTER
                                                            Case No. 02-14216-BB

1 | State of California that the foregoing is true and correct.

2 | Executed this __15__ day of November, 2013 at Fountain Valley, California.

*[signature]*
Peter R. Moenter

# PROOF OF SERVICE

I am a resident of the State of California and over the age of eighteen years, and not a party to the within action; my business address is One Market, Spear Street Tower, San Francisco, CA 94105-1126. On **November 15, 2013**, I served the within document(s):

**REBUTTAL REPORT AND DECLARATION OF PETER R. MOENTER**

☐ **(Via Email Transmission)**

☐ **(Via Facsimile)** by transmitting via facsimile the document(s) listed above to the fax number(s) set forth below on this date before 5:00 p.m.

☐ **(Via U.S. Mail)** by placing the document(s) listed above in a sealed envelope/box with postage thereon fully prepaid, in the United States mail at San Francisco, California addressed as set forth below.

☒ **(Via Overnight Delivery – Federal Express)** by placing the document(s) listed above in a sealed Federal Express envelope and affixing a pre-paid air bill, and causing the envelope to be delivered to a Federal Express agent for delivery.

☒ **(Via Hand Delivery)** I caused the envelope(s) to be delivered by hand to the addressee(s) noted below. I delivered to an authorized courier or driver of to be delivered on the same date. A proof of service signed by the authorized courier will be filed with the court upon request.

| Attorney/Counsel | Method of Service |
|---|---|
| Dennis D. Davis, Esq.<br>Goldberg, Stinnett, Davis & Linchey<br>A Professional Corporation<br>44 Montgomery Street, Suite 850<br>San Francisco, CA 94104<br>ddavis@gsdllaw.com | Hand Delivery |
| Craig A. Pinedo<br>PinedoLaw<br>425 California Street, 19th Floor<br>San Francisco, CA 94104<br>cpinedo@pinedolaw.com | Federal Express |
| Gary Fergus<br>Fergus, A Law Office<br>595 Market Street, Suite 2430<br>San Francisco, CA 94105 | Federal Express |

DB2/ 24245800.1

PROOF OF SERVICE

1

2         Executed on **November 15, 2013**, at San Francisco, California.

3         I declare under penalty of perjury, under the laws of the State of California and the United States of America, that the foregoing is true and correct.

4

5                                               Rachele Bohnet

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DB2/ 24245800.1                            PROOF OF SERVICE